UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Pure Parlay, LLC,

            Plaintiff

  v.

Stadium Technology Group, Inc.; GVC Holdings, PLC;

            Defendants

Case No. 2:19-cv-00834-CDS-BNW

**Order Granting Motion for Judgment on the Pleadings and Closing Case**

[ECF No. 74]

      In this patent-infringement lawsuit, defendants Stadium Technology Group and GVC Holdings seek judgment on the pleadings to dismiss plaintiff Pure Parlay's suit with prejudice. Defendants allege that Pure Parlay's patent is directed toward patent-ineligible subject matter and thus an infringement claim is not viable. Because the patent is directed toward the abstract idea of flexible point shading in a multi-game sports wager and employs no "saving" patent-eligible innovative concept, I find that the patent is, indeed, directed toward patent-ineligible subject matter and therefore grant defendants' motion. The Clerk of Court is directed to enter judgment accordingly and close this case.

I.     Relevant Background Information

      *a. Procedural History*

      Pure Parlay filed suit in May 2019, alleging that Stadium and GVC infringed its patent, U.S. Patent No. 9,773,382 (the '382 patent). *See generally* Third Am. Compl., ECF No. 65. United States District Court Judge Gloria M. Navarro[1] denied defendants' motion to dismiss the third-amended complaint based on her finding that Pure Parlay sufficiently pled divided infringement,

---

[1] Judge Navarro previously presided over this case, but it was administratively reassigned to me in April 2022.

an issue that I need not further address to resolve the instant motion. *See generally* Order, ECF No. 72. Now, the defendants move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c); they contend that the '382 patent concerns unpatentable subject matter and thus cannot support a claim of infringement. *See generally* Mot., ECF No. 74. Pure Parlay opposes the motion (ECF No. 77), and defendants reply. ECF No. 78. I held a hearing on December 6, 2022, so the parties could present further argument. ECF No. 84.

    b.  *The '382 Patent*

The '382 patent underlying this suit pertains to multi-game wagering (colloquially, "parlays")[2], which is a form of sports betting. The patent is titled "Computer-Implemented System and Method for Making Multiple-Game Sporting Event Wagers" and discloses:

> A system and method for effecting a multiple-arm wager incorporating a plurality of events, such as sporting events, including accessing a wagering system of the type including a central computer accessible by at least one network terminal interconnected thereto and hosting an executable instruction set for computing intermediate revised odds between a minimum and a maximum as a function of bettor-selected point shades to modify the line applicable to selected individual competing event teams for determining whether the selected teams have won the game for the purposes of the wager. The line for each team is individually selectively point-shaded in accordance with the wishes of the bettor, and the betting odds for the wager are calculated as a function of the total number of points shaded for the selected teams.

Patent Abstract, ECF No. 65-1 at 1. The '382 patent has one independent claim, which states that it is "[a] computer-implemented method for providing increased wagering flexibility to an individual bettor in the process of making a multiple[-]armed event wager from an electronic wager input device having a display[.]" *Id.* at 15. The method is comprised of "providing and accessing a wagering system," "selecting a plurality of teams" to put in the wager, "determining baseline odds" for the wager, defining the increment of point shading and maximum amount of points that can be shaded, calculating the minimum and maximum potential return of the bet

---

[2] A parlay "is a single wager that links together two or more individual bets, and the wager is dependent upon each of those individual bets winning in order to win the overall wager." ECF No. 65-1 at 7. The parties interchangeably call the individual bets constituting one part of the parlay "arms" or "legs" of the parlay. *Id.*

based on the permissible amount of point shading, "choosing, by [the] bettor" the number of points to shade, "combining the chosen quantity of points shaded for each team to obtain a total point shade value," calculating the revised odds based on that total point shade value, and then "placing the wager at the calculated revised odds." *Id.* The '382 patent claims neither any particular technology nor any unique physical component to implement its method.

In less technical terms, the '382 patent essentially claims a method for bettors to place multi-arm wagers wherein the bettor can "shade"[3] the line on each arm of the bet. *See* ECF No. 65-1 at 8 (summarizing the claimed invention). Using a visually displayed parlay card layout, the bettor can "redistribute point shades to a predetermined betting line." *Id.* The user's inputs, as defined by how much they shade the original betting line, result in a changed payout for the wager. *Id.* at 8–9. That prospective payout updates as the user slides the spread further from the original line. *Id.* at 9. Pure Parlay claims two departures from parlay betting interfaces in the prior art (*i.e.*, other methods for placing multi-team sports wagers). First, provision of "an opportunity to alter the shading value and shading direction for **individual arms** of a multi-team wager." *Id.* at 10 (emphasis added). And second, the graphical interface displaying the same, with real-time changes in the prospective payout as each arm is shaded. *Id.* at 15.

To exemplify the concepts described above, take a traditional three-team parlay returning 6-to-1 on a bet where Team A is a seven-point favorite (displayed as "Team A –7"), Team B is a ten-point favorite ("Team B –10"), and Team C is a four-point underdog ("Team C +4"). To win the parlay, the bettor would need Team A to win by seven or more, Team B to win by ten or more, and Team C to win outright or lose by four or fewer points. *See* ECF No. 65-1 at 7 (using this example in the background information of the patent). The '382 patent describes a method allowing the bettor to "shade" each line of the parlay, for example, by purchasing six

---

[3] "Shade" refers to the number of points a bettor shifts the betting line from the line established by the bookmaker, with the consequence of more "shade" resulting in greater variation from the market payout. *See* ECF No. 65-1 at 7 (describing an example of a bettor "shading" the line of a parlay by six points per arm).

points on each leg. *Id.* Team A turns into a one-point favorite ("Team A −1"), Team B turns into a four-point favorite ("Team B −4"), and Team C turns into a ten-point underdog ("Team C +10"). *Id.* With the six point "shade" applied, the bettor is more likely to win their parlay, but the winning wager payout would drop from 6-to-1 to 2-to-1. *Id.*

## II. Legal Standards

### a. Motion to Dismiss under Rule 12(c)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (internal quotation marks and alteration omitted). Like a motion to dismiss under Rule 12(b)(6), a motion under Rule 12(c) challenges the legal sufficiency of the claims asserted in the complaint. *Id.* Indeed, a Rule 12(c) motion is "functionally identical" to a Rule 12(b)(6) motion, and courts apply the "same standard." *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (explaining that the "principle difference" between Rule 12(b)(6) and Rule 12(c) "is the time of filing"); *see also United States ex rel. Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).

Judgment on the pleadings should thus be entered when a plaintiff does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For the purposes of ruling on a Rule 12(c) motion, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031

(9th Cir. 2008).

    b.  *Motion to Dismiss for Patent Ineligibility Challenges Under 35 U.S.C. § 101*

Defendants argue that the '382 patent fails to claim patent-eligible subject matter under 35 U.S.C. § 101, based on the standards set forth in *Alice Co. v. CLS Bank International*, 573 U.S. 208 (2014). Patent eligibility under § 101 is an issue of law. *Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017). Accordingly, a district court "may resolve the issue of patent eligibility under Section 101 by way of a motion for judgment on the pleadings." *Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1078 (N.D. Cal. 2016), *aff'd* 684 Fed. App'x 971 (memorandum decision) (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1351 (Fed. Cir. 2014) (affirming determination of ineligibility made on motion for judgment on the pleadings)).

Although claim construction is often desirable, and may sometimes be necessary, to resolve whether a patent claim is directed to patent-ineligible subject matter, "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., LLC v. Sun Life Assur. Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). When a court has a "full understanding of the basic character of the claimed subject matter," the question of patent eligibility may properly be resolved on the pleadings. *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1349 (Fed. Cir. 2014).

    c.  *Substantive Patentability Standards Under 35 U.S.C. § 101*

        i.  *Patent-Eligible Subject Matter*

Title 35, § 101 of the U.S. Code "defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). Under § 101, the scope of patentable subject matter encompasses "any new or useful process, machine, manufacture, or composition of matter, or any new or useful improvement thereof." *Id.* (quoting 35 U.S.C. § 101). These categories are broad but limited. Section 101 "contains an important implicit exception: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (quoting

*Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

These three categories of subject matter are patent-ineligible because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Laby's, Inc.*, 566 U.S. 66, 71 (2012) (citations omitted). Allowing patent claims for such purported inventions would "tend to impede innovation more than it would tend to promote it," thereby thwarting the primary objective of the patent laws. *Id.* However, the Supreme Court has also cautioned that "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* Accordingly, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice*, 573 U.S. at 217 (citing *Mayo*, 566 U.S. at 71).

In *Alice*, the Supreme Court "refined the 'framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts.'" *Voip-Pal.Com, Inc. v. Apple Inc.*, 375 F. Supp. 3d 1100, 1125 (N.D. Cal. 2019) (quoting *Alice*, 573 U.S. at 217). This framework involves the following two-step inquiry:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'"—*i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Alice*, 573 U.S. at 217–18 (alterations in original) (citations omitted); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (describing and applying "the now familiar two-part test described by the Supreme Court in *Alice*").

    ii.  Alice *Step One – Identification of Claims Directed to an Abstract Idea*

There is no bright-line test to separate abstract ideas from concepts that are sufficiently concrete to end the *Alice* inquiry. *Voip-Pal.Com*, 375 F. Supp. 3d at 1125 (collecting cases). Thus, in evaluating whether claims are directed toward patent-ineligible abstract ideas, courts generally

begin "by compar[ing] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

The first step of the *Alice* inquiry is a meaningful one through which the court must identify, based on the specific facts at issue in a case, "a substantial class of claims [which] are *not* directed to a patent-ineligible concept." *Id.* at 1335. The court's task is not to determine whether claims merely involve an abstract idea at some level, *see id.*, but rather to examine the claims "in their entirety to ascertain whether their character as a whole is directed to some excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).

### iii. Alice *Step Two – Evaluation of Abstract Claims for an Inventive Concept*

Even if a claim involves an abstract idea, that does not foreclose its patentability. "A claim drawn to an abstract idea is not necessarily invalid if the claim's limitations—considered individually or as an ordered combination—serve to 'transform the claims into a patent-eligible application.'" *Voip-Pal.Com*, 375 F.3d at 1127–28 (quoting *Content Extraction*, 776 F.3d at 1348). Thus, the second step of the *Alice* analysis asks whether the claim contains an element or combination of elements that "ensure[s] that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217–18.

Transforming an abstract idea into one that is patent-eligible requires more than simply reciting the idea followed by "apply it." *Id.* at 221. Likewise, "mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea" when those components simply perform their "well-understood, routine, [and] conventional" functions. *TLI Commc'ns*, 823 F.3d at 613 (citation omitted). "The question of whether a claim element or combination of elements is well-understood, routine[,] and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). This inquiry "goes beyond what was simply known in the prior art." *Id.* at 1369. Furthermore, "limiting an abstract idea to one field of

7

use or adding token postsolution components [does] not make the concept patentable." *Bilski*, 561 U.S. at 612 (citing *Parker v. Flook*, 437 U.S. 584 (1978)). Attempts to "limit the use of the abstract idea to a particular technological environment" are insufficient to render an abstract idea patent eligible. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (internal quotation marks and citation omitted). Finally, a "non-conventional and non-generic arrangement of known, conventional pieces" can amount to an inventive concept. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016) (wherein claims recited an inventive concept because they contained "specific enhancing limitation[s] that necessarily incorporate[d] the invention's distributed architecture," and the use of such distributed architecture transformed the claims into patentable subject matter).

    iv. *Representativeness*

When claims of a patent are substantially similar and linked to the same abstract idea, courts may focus their analysis on representative claims rather than analyzing each claim of the patent at issue. *See, e.g.*, *Content Extraction*, 776 F.3d at 1348 (focusing the *Alice* analysis on a single representative claim); *Voip-Pal.Com*, 375 F. Supp. 3d at 1129 ("the [c]ourt need not individually analyze every claim if certain claims are representative.") (citing *Alice*, 573 U.S. at 224–28). Courts may treat a claim as representative "if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer*, 881 F.3d at 1365 (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016)).

  d. *Leave to Amend*

If a court determines that a complaint should be dismissed, it must then decide whether to grant leave to amend. Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities."

*Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend should generally be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

### III. Discussion

#### a. Alice *Step One*

Step one of the *Alice* inquiry considers the claims "in light of the specification" to determine "whether their character as a whole is directed to excluded subject matter." *Enfish*, 822 F.3d at 1335 (citation omitted). I am careful not to express the claim's focus at an unduly "high level of abstraction . . . untethered from the language of the claims," but rather in parallel with the level of generality or abstraction expressed in the claims themselves. *Id.* at 1337; *see also Thales Visionix v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017) (requiring courts to "ensure at step one that [they] articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful"). My inquiry therefore "centers on determining the 'focus' of the claims." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1340 (Fed. Cir. 2017), *cert denied*, 139 S. Ct. 378 (2018).

Defendants assert that the '382 patent is directed to the abstract idea of managing a multi-game sports wager. ECF No. 74 at 7. Plaintiff asserts that the '382 patent is directed to a method for increasing wagering flexibility for bettors making multi-game sports wagers from electronic wager input devices with a display (*i.e.*, "a smartphone or tablet"). ECF No. 65-1 at 9. Plaintiff's description is more specific but nonetheless fails to escape the realm of abstraction. The increased wagering flexibility arises from the use of a drop-down menu or slide-bar to

change the line of each arm of a parlay while the odds update in real time. The drop-down menus, the software necessary to carry out the '382 patent's method, and the device used to place bets are tangible things outside the scope of the '382 patent's claims. The '382 patent simply seeks to cover the abstract idea of allowing a bettor to shade multiple lines within a parlay.

Three jurisprudential themes demonstrate that claim 1 of the '382 patent is directed toward an abstract idea. First, the claimed method discloses only generalized steps drafted in purely functional terms. "Generalized steps to be performed on a computer using conventional computer activity are abstract." *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017). The '382 patent describes an abstract idea, in part, due to the level of abstraction of its claims, all of which describe generalized steps to be performed on a computer, phone, or tablet. Claim 1, in fact, describes "[a] computer-implemented method . . ." for providing wagering flexibility to a bettor devising a parlay. ECF No. 65-1 at 15. The method is comprised of equally generic steps, which are: "providing and accessing a wagering system," "selecting a plurality of teams," "determining baseline odds," "defining" or "calculating" a series of terms (*i.e.*, the maximum amount of point shading permitted, the odds for each prospective line, etc.) necessary for the operation of the method, "choosing" by the bettor of how many points to take, "combining" the shade for each arm of the parlay, and "calculating" the total odds of the bet in consideration of the bettor's shade choices. *Id.* None of these steps purports to explain *how* the '382 patent's method is effectuated with sufficient specificity. For example, the patent does not reveal the inputs or outputs of the calculation steps. It does not describe how the maximum amount of permissible shade is determined. It does not list any specific computer program or function used to carry out its steps. In total, the '382 patent simply describes generic steps to be performed by a computer using undescribed computer activity.

Second, this method is analogous to well-known, long-standing practices in the sports betting industry. Counsel for Pure Parlay admitted at oral argument that sports books have long

10

permitted bettors to shade a single line of a sports bet. *See* Hr'g Tr., ECF No. 86 at 26 ("We haven't suggested that we invented the notion of shading at least as far as it goes with one bet. With a single bet, not a multi-armed bet."). The purported innovation here just extends the long-standing practice of permitting shading a single sports bet to multiple arms of a parlay. Even taking as true plaintiff's assertion that the '382 patent covers a method that, for the first time in history, would allow a bettor to shade multiple arms of a multi-armed sports wager, it nonetheless still claims a method that is analogous to the long-standing practice of permitting shade on a sports bet. The only difference here is that three games may be shaded as part of a single multiple-armed bet, rather than allowing a bettor to shade three individual games as separate bets.

And third, the '382 patent does not recite an improvement in computer functionality. Specifications which "are not directed to a specific improvement to computer functionality" and fail "to provide any technical details for the tangible components, [and] instead predominately describe[] the system and methods in purely functional terms" concern unpatentable subject matter. *TLI Commc'ns*, 823 F.3d at 612. Claim 1 describes the purported method in broad, generic functional terms but fails to identify *how* those ends are achieved via unique software or hardware configurations. *See* ECF No. 65-1 at 15 (no mention of any software or hardware beyond surface-level). The most specific claim 1 gets is in its first subclaim for "providing and accessing a wagering system of the type including a central computer system accessible by at least one network terminal in bi-directional electronic communication therewith via an electronic network and having a bettor viewable display," where the central computer system hosts a set of executable instructions for the later steps. *Id.* This is just a generic description of computer hardware; the '382 patent describes neither the executable instructions that must be hosted on the central computer system nor the hardware specifications of the computer system (beyond being able to communicate with an electronic network and having a display). It also does not indicate a unique configuration of otherwise generic components. Because the '382

patent is simply too generic in how its claimed method is effectuated, it is focused toward an abstract idea.

      b.   Alice *Step Two*

Claim 1 does not recite an inventive concept. "To save the patent at step two, an inventive concept must be evident in the claims." *RecogniCorp*, 855 F.3d at 1327. In assessing whether a claim recites an inventive concept, I must consider its elements "both individually and as an ordered combination." *Alice*, 573 U.S. at 217. Accordingly, I first analyze the individual elements of Claim 1 and then turn to the ordered combination of those elements. Neither analysis evinces an inventive concept and thus, the '382 patent cannot be salvaged.

          i.   *The Individual Claim Elements Do Not Provide an Inventive Concept*

To supply an inventive concept, a claim element "must be more than well-understood, routine, conventional activity." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016). It "cannot simply be an instruction to implement or apply the abstract idea on a computer." *BASCOM*, 827 F.3d at 1349. For example, it may be found in an "inventive set of components or methods," "inventive programming," or an inventive approach in "how the desired result is achieved." *Elec. Power Grp.*, 830 F.3d at 1355. On the other hand, "conventional steps, specified at a high level of generality, [are] not enough to supply an inventive concept." *Alice*, 573 U.S. at 222 (internal quotation marks omitted). Nor are "generic computer, network, and Internet components" inventive. *BASCOM*, 827 F.3d at 1349. Yet, conventional steps and generic computer components are all that Claim 1 describes.

Each step of the claimed method is a conventional step undertaken by generic computer components: some steps involve actions from the bettor, like "accessing" the wagering system, "selecting a plurality of teams," "choosing . . . a quantity of points to shade," and "placing the wager." ECF No. 65-1 at 15. The other steps involve simple computation: "determining baseline odds for said" parlay, "defining" the maximum amount of points that can be shaded and what increment they can be shaded, "calculating" the minimum and maximum possible odds based on

those definitions, "combining" the chosen quantity of points shaded, and ultimately "calculating" the total odds for the parlay. *Id.* Pure Parlay does not assert that any of these steps are novel or unique. Instead, it asserts that "the mechanism and the manner in which . . . the bettor is making [the] line adjustment" is the innovative concept. ECF No. 86 at 27–28. It alleges that the "sliding mechanism" constitutes that mechanism and manner and that the bettor's "interaction with the device" and ability to interface with the slide-bar to shade points on each arm of the parlay "is really what [it] would call an improvement to the betting [and] the technology[.]" *Id.* at 30, 33.

However, a user interacting with a sliding bar on a computer does not come close to the level of innovation necessary to save the '382 patent's abstract idea from unpatentability. Invocation of generic computer parts used in a conventional manner does not constitute an inventive concept—far from it. *See Content Extraction*, 776 F.3d at 1347–48 ("For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of [the *Alice*] analysis, it must involve more than the performance of well-understood, routine, [and] conventional activities previously known to the industry." (internal quotations omitted)). Furthermore, to the extent that Pure Parlay argues that its sliding mechanism is unique or novel in the parlay-betting context, it fails to explain how that novel idea constitutes an inventive concept. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("[A] claim for a *new* abstract idea is still an abstract idea. The search for a § 101 inventive concept is thus distinct from demonstrating § 102 novelty.").

          ii.   *The Ordered Combination of Claim Elements Does Not Provide an Inventive Concept*

Pure Parlay also argues that the ordered combination of claim elements provides an inventive concept. It asserts that the innovation is the combination of allowing the bettor to "choos[e] . . . a quantity of points to shade," and then "calculating . . . respective revised odds for the wager." ECF No. 77 at 9. It notes that, previously, "bettors did not set their own lines on each team in a multiple team wager and obtain revised odds/payouts associated with a wager

13

thereon." *Id.* However, this representation overstates the method claimed by the '382 patent. The patent-at-issue does not permit bettors to "set their own lines," as that would allow bettors far more flexibility than requiring them to shade points of a line already set; it simply permits bettors to bet within a predetermined range of points via a slide bar. Defendants point out that plaintiff conflates its abstract idea—being able to shade points for each game of a parlay via sliding mechanism—with "innovation in the non-abstract application realm." ECF No. 78 at 8. Indeed, a patent claiming innovation in the non-abstract realm would describe *how* the sliding mechanism is to be implemented, how the amount of points to be shaded is calculated, or other specific details indicating some computational upgrade or software innovation. This patent fails to do so.

  In conclusion, I find that claim 1 of the '382 patent describes generic steps undertaken by conventional computer parts. The method claimed by the '382 patent describes a series of abstract steps, with no specification as to how each step is to be carried out, and thus must be adjudged unpatentable. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1169 (Fed. Cir. 2018) (stating that claim details which are abstract or claim details that prevent one from plausibly inferring inventiveness recite no inventive concept and are thus properly subject to judgment on the pleadings).

  c. *Representativeness of Claim 1*

  Pure Parlay concedes that claim 1 is representative of the '382 patent. *See* ECF No. 77 at 4 ("Examining representative claim 1 of the '382 patent in its entirety reveals that the claim is directed to a method for increasing wagering flexibility . . ."); ECF No. 86 at 6 (counsel for Pure Parlay states "I do" in direct response to my question asking whether he "agree[s] that Claim 1 is representative of all the ['382 patent's] claims"). Claim 1 is also the only independent claim of the '382 patent. *See* ECF No. 65-1 at 15–16. Because claim 1 is representative of the '382 patent's other claims, I need not analyze the patent's remaining claims to affirm my determination of patent-ineligibility. *See Voip-Pal.Com*, 375 F. Supp. 3d at 1129 (stating, "the [c]ourt need not individually

14

analyze every claim if certain claims are representative") (citing *Alice*, 573 U.S. at 224–28).

      d.   *The '382 Patent is Patent Ineligible*

Because I find claim 1 of the '382 patent representative of the patent's other claims, and I have already found claim 1 to fail the *Alice* test—as it is directed toward an abstract idea and fails to adduce any innovative concept sufficient to transform the abstract idea into patent-eligible subject matter—I conclude that the entire '382 patent is directed toward unpatentable subject matter. An infringement suit is therefore unpermitted. *See Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 644 (2015) ("To say that an invalid patent cannot be infringed . . . is in one sense a simple truth, both as a matter of logic and semantics . . . [a]n accused infringer can, of course, attempt to prove that the patent in suit is invalid; if the patent is indeed invalid, and shown to be so under proper procedures, there is no liability."). Because Pure Parlay's suit for infringement cannot proceed based on an invalid patent, I must grant defendants' motion for judgment on the pleadings.

## IV.   Leave to Amend

Pure Parlay does not request leave to amend. Nonetheless, I may sua sponte deny leave to amend if it would cause undue delay or prejudice to the opposing party or if the amendment would be futile. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). Because plaintiff's claims of infringement are rooted in the language of the patent's claims and specification, which I find to be directed toward unpatentable subject matter, amendment would be futile. *See, e.g., NEXRF*, 547 F. Supp. 3d at 993 ("[T]he [c]ourt cannot foresee any allegations [p]laintiff could add that would solve one of the key issues with the purportedly inventive steps of the asserted patent claims—that they merely 'describe the functions of the abstract idea itself, without particularity.'" (quoting *Capital One Fin. Corp.*, 850 F.3d at 1341)).

V.  Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that defendants' motion for judgment on the pleadings **[ECF No. 74] is GRANTED**.

The Clerk of Court is instructed to enter final judgment in the defendants' favor and **CLOSE THIS CASE**.

DATED: January 20, 2023

_____
Cristina D. Silva
United States District Judge